# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

CEDRICK SALTER,

       Petitioner,

v.                                                Case No. 8:15-cv-2001-T-36CPT

SECRETARY, DEPARTMENT
OF CORRECTIONS,

       Respondent.

_____/

## ORDER

Cedrick Salter, a Florida prisoner, timely filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (Dkt. 1) challenging his Hillsborough County conviction. Respondent filed a response (Dkt. 8), and Salter filed a reply (Dkt. 11).[1] Upon consideration, the petition will be DENIED.

## Procedural History

Salter was convicted after a jury trial of one count of first degree murder and sentenced to life in prison. (Dkt. 10, Ex. 1f, pp. 107-08, 152). The state appellate court *per curiam* affirmed the conviction and sentence. (Dkt. 10, Ex. 1c). The state appellate court also *per curiam* affirmed the denial of Salter's motion for postconviction relief filed under Florida Rule of Criminal Procedure 3.850. (Dkt. 10, Exs. 2a, 2f, 2j).

## Facts[2]

Salter and Saquanda Simon, known as Mika, had two children together. Shortly before 5:00

---

[1] In his reply, Salter requests that the Court reconsider the earlier denial of his mother, Denise Salter's, request to proceed as Salter's "next friend." (*See* Dkt. 7, pp. 1-2). The Court declines to reconsider this decision.

[2] The factual summary is based on the trial transcript and appellate briefs.

p.m. on September 8, 2009, Salter sent a text message to Mika asking her whether they were "gonna work being together." Between 8:12 p.m. and 8:59 p.m., Salter sent Mika more text messages, including several in which he threatened to kill her.

Salter then arrived at the Tampa home where Mika and her children lived with her mother, Arleen Jackson, her brother, O.J. Bates, and Jackson's boyfriend, Joseph Bianco. Salter and Mika began angrily shouting at each other. Mika went into the master bathroom and closed the door. Salter attempted to open the bathroom door, and said that his life was over and that he wanted to talk to Mika outside. Jackson told Salter to get out of the house. Mika exited the bathroom and walked into the dining area. Bianco opened the front door and told Salter to leave; Bianco then walked back towards the master bedroom. Salter and Mika continued to argue, and Jackson noticed that Mika had her hand to her ear as if she was talking on the phone. Jackson heard Salter ask who Mika was talking to. O.J. Bates then saw Salter draw a gun from his right side and immediately "let off" two shots.[3] When Mika fell to the ground, Salter fled the house. Jackson called 911 at approximately 9:13 p.m. Mika died as a result of a gunshot wound to the head.

Salter turned himself in to police the next day. After waiving his *Miranda*[4] rights, he gave a recorded statement in which he denied that he and Mika had been arguing. Salter explained that he carried the gun for protection because people in the neighborhood had tried to rob him, and that he sent text messages to Mika to get her attention. He stated that Jackson was upset, and that he pulled the gun out to give it to Jackson so that she would know he was not going to hurt Mika. Salter said that Joseph Bianco and O.J. Bates attacked him when he pulled the gun out, causing him to lurch forward and

---

[3] Jackson's back was turned when the gunshots were fired.

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

accidentally fire the gun. He repeatedly denied any intent to kill Mika.

## Standard Of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000). A decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. *See also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition

for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed the denial of postconviction relief in a *per curiam* decision. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore,* 278 F.3d 1245, 1254 (11th Cir. 2002). *See also Richter,* 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018).

## Ineffective Assistance Of Counsel

Salter claims ineffective assistance of trial counsel. His claims are analyzed under *Strickland v. Washington*, 466 U.S. 668 (1984). Salter must demonstrate that his counsel performed deficiently in that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.*

Salter must also show that he suffered prejudice by demonstrating "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Obtaining relief on a claim of ineffective assistance of counsel is difficult because federal habeas review is "doubly" deferential to counsel's performance and the state court's decision. *Richter*, 562 U.S. at 105.

## Discussion

<u>Ground One</u>

At trial, the State introduced text messages sent from Salter's phone number to Mika's cell phone on the day she was killed. The State obtained these messages by looking at Mika's cell phone. The first message, sent at 4:58 p.m., stated, "Hey, I womna [sic] know if you seriously think we gonna work being together and if you–". (Dkt. 10, Ex. 1m, p. 656). The other text messages, sent between 8:12 p.m. and 8:59 p.m., stated, "Can you answer me?"; "Okay. I'm fucked up right now, I helped you get where you at in life. You ignoring me. I'm out here trying to deal with these problems and you turned your back now. Okay."; "I have nothing to lose or live for as of right now so be carefully [sic]."; "Threatening me will get you back into trouble.";[5] "We both dead. It don't matter anymore.";[6] "I'm gonna kill you no matter what when it's gonna happen."; "You already got me involved with the law."; and "I'm gonna kill you no matter what when it's gonna happen soon or later." (*Id.*, pp. 653-56).

Salter denies sending any messages threatening to kill Mika. He therefore alleges that someone must have tampered with Mika's cell phone. He notes that police did not recover Mika's cell phone

---

[5] Based on this message's content, it appears that Mika might have sent it to Salter.

[6] It appears that the message "We both dead. It don't matter anymore" was sent to Mika twice. (Dkt. 10, Ex. 1m, pp. 654-55).

from her family until 20 days after the shooting and contends that this delay shows "an opportunity to and an inference of tampering." (Dkt. 1, p. 8). Accordingly, he argues, trial counsel was ineffective in failing to hire an expert to investigate the source of the text messages. Salter claims that he was prejudiced because "the expert would have indeed found evidence of tampering and shown to the jury that petitioner did not send the messages that relate to 'killing' the victim, there would not have been any evidence to show a premeditated intent to kill." (*Id.*, p. 9). The state court denied this claim after an evidentiary hearing:

> In ground one, Defendant alleges trial counsel was ineffective for failing to hire an expert to investigate the source of certain text messages found on the victim's phone. Defendant alleges that the victim's cell phone was produced twenty days after her death. Defendant claims that he told his trial counsel that he did not send the text messages found on the victim's phone. Defendant argues that trial counsel was ineffective for failing to hire an expert to investigate whether the victim's phone had been tampered with after her death.

> Defendant claims that he was apprehended and taken to the police department where he confessed to the crime. He alleges that during the confession, he admitted to sending threatening text messages to the victim but never admitted that he sent text messages saying he would kill himself or the victim. Defendant next alleges that at the crime scene, a cell phone battery was recovered but that the cell phone could not be located. Defendant claims that twenty days after the shooting, the victim's mother located the cell phone and handed it over to the police along with a charger and battery. Defendant claims that the police obtained a warrant to download text messages on the phone, but that neither the cell phone provider nor the police department had the equipment necessary to download the text messages. Defendant claims that a detective took pictures of the texts. The text messages were sent from a phone number belonging to Defendant and contained language threatening the victim.

> Defendant next alleges that he advised counsel that he did not send the above-mentioned text messages and that he thought his phone had been tampered with. Defendant claims that counsel did object when the phone was introduced into evidence, and that the objection was based on an allegation that the cell phone had been tampered with by officials, but alleges that counsel did not investigate the issue any further. Defendant alleges that trial counsel should have hired an expert to investigate whether the phone had been tampered with after the shooting. Defendant alleges that had trial counsel hired an expert, the expert would have found evidence of tampering which would have shown that he did not send the text messages.

Defendant alleges that without the text messages, the State would not have been able to prove a premeditated intent to kill. Defendant alleges that had trial counsel hired an expert, he would have been convicted of a lesser included offense.

At the evidentiary hearing, Gregory Hill first testified about his employment history which included heading a private consulting firm, Forensic Development Services. He testified that for a period of time he consulted with the Department of Justice with regards to the development of a digital evidence program. Mr. Hill testified that "the digital evidence program that the Department of Justice was initiating was to assist lawyers and law enforcement in terms of understanding the nuances in the integration of digital evidence, computers, cell phones, text messaging, things of that nature, into a program where they could put out a training program to particular individuals". Mr. Hill testified that to some degree, because of his experience heading his consulting firm, he became familiar with how text messaging works and how systems could be tampered with. Gregory Hill further testified as follows:

> STATE: Did you become aware that there were some text messages between Defendant and the victim that became at issue?
>
> MR. HILL: Yes, we did.
>
> STATE: All right. And what was the nature of these text messages if you recall?
>
> MR. HILL: There were a number of threatening text messages that were sent from Mr. Salter's cell phone to the victim's cell phone during the course leading up to, in fact, just moments before the actual shooting.
>
> STATE: Do you recall if the State of Florida had access to the victim's cell phone or at least those text messages?
>
> MR. HILL: As I recall, it did, yes.
>
> STATE: All right. And were those turned over to you as – to the best of your recollection?
>
> MR. HILL: As part of discovery, they were.
>
> STATE: All right. What about Defendant's phone? Do you know if the State of Florida ever had access to Defendant's cell phone and/or his text messages?
>
> MR. HILL: As I recall, Mr. Salter indicated to us that he had lost his cell phone somewhere during the course of time, and that it was later

recovered a number of days after the event from the victim's mother, given to law enforcement, and those messages were also given to us as part of discovery.

STATE: Do you recall if when reviewing those messages, both for trial and even perhaps for today's hearing, if you found any inconsistencies between the text messages going between the two phones?

MR. HILL: No. Those were synched both the date time stamped on the respective phones.

STATE: Were these text messages a concern for Mr. Salter in terms of his defense?

MR. HILL: They were because they were very explicit in terms of threatening both – both killing her and killing himself.

STATE: And are these – did you have conversations with Mr. Salter about these text messages and his theory about these text messages that continued to escalate leading up to the offense?

MR. HILL: We did. Mr. Littman [the first attorney assigned to the case] had initially contacted Mr. Salter when that was represented to – and contained in the case file that there was a certain text message expressly threatening to kill the victim, that he did not send that message. But the other messages that were sent were not disputed, according to Mr. Littman's notes, and the interview that Mr. Salter gave to law enforcement, he admitted that he sent those text messages, without carving out that one message, not as threatening, but only to get her attention because she did not apparently respond to his text messages.

STATE: Was there anything you did upon speaking to both Defendant, as well as reading Mr. Littman's notes, regarding Defendant's theory on the text messages that you did to help decide whether or not there may have been some tampering with these text messages?

MR. HILL: We did, actually. And, again, last week I was able to go through the case file with Ms. Shane and some of the electronic files that were maintained. Mr. Littman had – the Public Defender's Office, as part of the process in order to hire an expert witness, you have to request the authorization of funds, and that expenditure had been authorized through – you know, I dropped his name – but it was U.S. Forensics. That was the name of the company I believe in Pinellas

County that Mr. Littman had initially requested funds from to be secured for.

Prior to expending any of those funds, I contacted Rick Green was his name, I believe. I contacted Mr. Green at U.S. Forensics and had a brief conversation with him, relying on my knowledge of the digital evidence and brief interaction with him, and whether that would be capable from just the cell phones itself. He told us that it would not be capable. So we investigated that.

Also, Mr. Littman had sent an investigation request to the investigators of the unit, and Investigator Pomponio had contacted T-Mobile to see whether such a process could be accomplished, and he was informed that it would not be.

STATE: All right. And do you know if either Investigator Pomponio or another investigator went out to meet with Defendant as well to discuss this theory with him and the results of their work?

MR. HILL: Prior to my taking over, I don't know whether they did. I know that we – I know Investigator Pomponio and myself did go speak with him. Also, Investigator Griffin, who was later – replaced Mr. Pomponio, went out and spoke to him about that as well.

STATE: Once you had conducted that portion of the investigation, did you have a final discussion with Defendant regarding whether or not it was a viable defense or theory of defense that there had been tampering with these text messages?

MR. HILL: We did have a conversation about that. The ultimate decision that was made was that there was no indication – there's no evidence of tampering, so there was no good faith basis to put that forward, as well as impeachment of that evidence, if that were an avenue that we approached.

STATE: Do you recall if at any point in time prior to the case being set for trial Ms. Shane litigated a motion in limine regarding the text messages?

MR. HILL: We did litigate a motion on that.

STATE: And then at trial did you again establish or assert a motion in limine again with some additional case law on the issue to the trial judge, Judge Battles?

MR. HILL: I believe we did, yes.

STATE: All right. And in each of those situations was it your intent and did you make an effort to have those text messages either redacted or suppressed, or just excluded altogether from the trial?

MR. HILL: Yes, we tried exclude them initially and then redact them, particularly since the way the messages were conveyed to the – on the evidence was photographs of the text messages, so they overlapped and were redundant in a number of cases.

STATE: And were your efforts, either pretrial or during trial, successful in terms of excluding any of those text messages?

MR. HILL: Only in terms of minimization of the redundancy.

After reviewing Defendant's allegations, the testimony and evidence adduced at the June 17, 2014, evidentiary hearing, the court file, and the record, the Court finds the testimony of trial counsel Gregory Hill to be credible. The Court notes that there is a strong presumption that trial counsel's performance was not ineffective. *See Strickland*, 466 U.S. at 690. A fair assessment of attorney performance requires that "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689. "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000). Further, the defendant carries the burden of overcoming the presumption that a decision might be considered sound trial strategy. *Strickland*, 466 U.S. at 689.

At the outset, the Court finds that to the extent Defendant is alleging trial counsel was ineffective for failing to investigate whether the text messages had been tampered with, this claim has no merit. Trial counsel investigated the text messages himself using the knowledge and experience he gained through his consulting company, he contacted and discussed the tampering claim with U.S. Forensics and T-Mobile which both determined that there was no tampering, and investigators with the Public Defender's Office also investigated the issue and met with Defendant in jail to inform him that there was no evidence of tampering. As such, trial counsel cannot be deemed ineffective for failing to investigate the tampering claims as the record demonstrates that trial counsel did investigate the tampering claims.

To the extent Defendant is alleging trial counsel was ineffective for failing to hire an expert witness to investigate the text messages and pursue a tampering defense, the Court finds trial counsel was not ineffective. The Court finds that trial counsel made a strategic decision not to hire an expert to support a partial defense of tampering. The

record demonstrates that based on the findings that there had been no signs of tampering made by the investigators with the Public Defender's Office, U.S. Forensics, and T-Mobile, trial counsel made a strategic decision not to hire an expert as there was no good-faith basis to pursue a tampering defense. The Court finds that this strategic decision was reasonable as the above-mentioned parties determined there was no basis for tampering. Further, where counsel has a reasonable basis to believe that pursuing certain lines of defense would be fruitless, counsel does not act unreasonably in not pursuing them. *See Beasley v. State*, 18 So. 3d 473, 485 (Fla. 2009). Last, there was no evidence presented at the evidentiary hearing to establish that the text messages had been tampered with. Accordingly, no relief is warranted. The Court must deny ground one of Defendant's motion.

(Dkt. 10, Ex. 2j, pp. 270-76) (court's record citations and footnotes omitted).

The state court's determination that Hill's testimony was credible is a factual finding that is presumed correct. Salter has not rebutted the presumption of correctness by clear and convincing evidence. *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the state court, including the credibility findings, are presumed to be correct unless [the petitioner] rebuts the presumption by clear and convincing evidence." (citing 28 U.S.C. § 2254(e)(1))).[7] Hill's testimony shows that he did investigate the possibility of tampering. Hill and an investigator spoke with Salter about this matter and contacted both a forensics company, U.S. Forensics, and the cell phone's network carrier, T-Mobile. (Dkt. 10, Ex. 2i, p. 245). But Hill's testimony shows that the companies responded that examining the cell phone would not establish whether tampering occurred. (*Id.*). *Strickland* states:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision

---

[7] In his reply, Salter alleges that Hill gave perjured testimony at the evidentiary hearing. He points to Hill's testimony that he recalled looking at Salter's cell phone. Salter correctly notes that the trial evidence indicates that his cell phone was never recovered. (Dkt. 10, Ex. 1m, pp. 664). However, Salter has not shown that Hill's testimony was a deliberately false remark instead of a mere misstatement about the evidence made available in discovery. Nor does Salter establish that Hill gave any false testimony about his investigation into potential tampering.

that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

In light of the responses Hill received from U.S. Forensics and T-Mobile, and in the absence of any evidence that Mika's phone was actually tampered with, Salter does not show that Hill acted unreasonably in deciding not to hire an expert to further investigate Salter's speculative tampering claim. As the state court did not unreasonably apply *Strickland* or unreasonably determine the facts in concluding that counsel made a reasonable strategic decision not to hire an expert, Salter is not entitled to relief on Ground One.

Ground Two

Ground Two involves the potential defense that the killing occurred in the heat of passion.

The defense of "heat of passion" is well established in Florida. It can be a complete defense if the killing occurs by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation. *See* § 782.03, Fla. Stat. (2002); *see also* Fla. Std. Jury Instr. (Crim.) On Excusable Homicide. Or, . . . it can be used as a partial defense, to negate the element of premeditation in first degree murder or the element of depravity in second degree murder. *See, e.g., Douglas v. State*, 652 So.2d 887 (Fla. 4th DCA 1995).

*Villella v. State*, 833 So. 2d 192, 195 (Fla. 5th DCA 2002).

The heat of passion defense has been further discussed in Florida decisions:

"Heat of passion" has best been defined in *Disney v. State*, 72 Fla. 492, 73 So. 598, 601 (1916):

A killing in the 'heat of passion' occurs when the state of mind of the slayer is necessarily different from that when the killing is done in self-defense. In the heat of passion the slayer is oblivious to his real or apparent situation. Whether he believes or does not believe that he is in danger is immaterial; it has no bearing upon the question. He is intoxicated by his passion, is impelled by a blind and unreasoning fury to redress his real or imagined injury, and while in that condition of frenzy and distraction fires the fatal shot.

*Daley v. State*, 957 So. 2d 17, 18 (Fla. 4th DCA 2007).

Salter claims that counsel was ineffective in failing to present a heat of passion defense and in failing to request a jury instruction on this defense. He claims that the text messages show his "state of mind" immediately before the shooting, and claims that he was provoked because he thought Mika was on the phone with another man. The state court denied this claim:

> In ground two, Defendant alleges trial counsel was ineffective for failing to put forth a viable defense of passion and request an instruction on said defense when evidence introduced at trial clearly supported this theory of defense.

> Defendant first provides the Court with case law detailing the "heat of passion" defense. Defendant next provides the Court with a summary of the evidence presented at trial. Defendant alleges the evidence established that hours prior to the shooting, Defendant began sending threatening text messages to the victim. The evidence established that Defendant arrived at the victim's residence and began to argue with the victim. When the victim refused to talk to Defendant, he became emotional and stated that "his life was over." Defendant argues that the testimony presented at trial established that Defendant believed that the victim was engaged in a relationship with another man. Defendant alleges that the evidence established that he fired two shots at the victim. Defendant claims he testified that he did not go to the victim's residence with the intent to kill her, and that he brought a gun for protection because he had been robbed before in that neighborhood.

> Defendant next alleges that the content of the text messages revealed Defendant's "state of mind" immediately prior to the shooting. Defendant argues that the texts coupled with the fact that Defendant was provoked when the victim began talking on the phone with another man established an element of passion: "suspended exercise of judgment and a domination of volition".

> Defendant claims that a crime of passion "can be used as a partial defense to negate the element of premeditation in first degree murder or the element of depravity in second degree murder". Defendant alleges that counsel was ineffective for failing "to put on a crime of passion defense and request an instruction" on said defense. Defendant alleges that had counsel pursued a heat of passion defense, he would have been found guilty of a lesser-included offense.

> At the evidentiary hearing, Defendant testified that his attorneys did not advise him that there was a defense for a crime of passion, and had he known the defense existed, he would have requested his attorneys pursue such a defense. Defendant next clarified that his attorney actually told him that his case was not a crime of passion, but could not remember why the attorney said so. Defendant testified that he learned about the

defense while in prison.  During cross-examination, Defendant testified that his theory of defense at trial was that the shooting was accidental and that the gun accidentally went off after he was attacked.

At the evidentiary hearing, Gregory Hill and Anne Shane testified as to why they did not pursue a heat of passion defense.  Their testimony is as follows:

> STATE: Did you become familiar with certain issues in the case that you began to explore when you began to defend and prepare for trial?
>
> MR. HILL: Yes.  Obviously the first and most critical for us was to develop a viable defense for Mr. Salter.
>
> STATE: And based on your conversations with Mr. Salter and the facts as you read them in the police report and through witness depositions, what was his defense?
>
> MR. HILL: His defense, and what he had maintained throughout the case, was the fact that this was an accidental shooting.  He went over to his girlfriend's home and had an encounter with two male subjects in the house.  And when he pulled out a gun to show that he meant no ill-will, he was jumped by one of the subjects and the gun was accidentally discharged.
>
> STATE: And is that – having heard that defense, having read the police report and depositions, is that a defense that you and Ms. Shane discussed with the defendant and intended to pursue?
>
> MR. HILL: Yes, it was.
> . . .
>
> STATE: You discussed for us a little bit your initial conversations with the defendant regarding what a viable defense would be and what you all would pursue at trial.  At any point in time in your discussions with the defendant, and even in your discussions with Anne Shane, did you all discuss a theory of a defense of passion or a crime of passion as a theory of defense?
>
> MR. HILL: Passion was never put forward by Mr. Salter as an issue from his perspective.  It was also inconsistent with an interview he gave to law enforcement, as well as representations in statements made to myself and the investigator.
>
> STATE: Did you ever discuss with him, just bring up, hey, by the way, why don't we try this passion defense?

MR. HILL: I'm sure we discussed it. I don't recall the specific date or time of that, only because Mr. Salter was adamant that it wasn't passion. He had only sent the text messages, as he indicated to law enforcement prior, that it was only to get her attention.

STATE: And would you have been able in good faith to present that theory of defense based on the information that you had from the defendant and the case file?

MR. HILL: I would have found it a stretch to present it in good faith. Our thought process at the time was it was much more a greater risk in terms of a viable defense, as well as credibility, that [the] jury would believe, you know, [the] ultimate defense of, well, it was purely accidental, which was much more substantial and sustained by not only Mr. Salter's statements, but also by other evidence in the case.

STATE: And are those discussions that you had with Mr. Salter prior to going to trial and preparing your defense for trial?

MR. HILL: Yes, they were.

STATE: And so you intended, when you stood up and start trial on this case, not to present anything about the crime of passion as a defense.

MR. HILL: Correct. The decision had been made not to pursue a passion defense.

. . .

STATE: Did you ever have conversations with the defendant or Mr. Hill in terms of what was the theory of defense and the most viable theory of defense for you all to pursue?

MS. SHANE: Yes. That's why as soon as I – probably one of the first conversations I had with Mr. Hill when I was at the second chair was, okay, what's the case and what's our defense; so, certainly, I mean, that's one of the first things you get involved in, what kind of case is it.

STATE: And was there any discussion between you and Mr. Hill regarding a defense of passion or a crime of passion in terms of a theory of defense?

MS. SHANE: No.

STATE: Is that a conversation that you all ever had with the defendant, Mr. Salter?

MS. SHANE: No.

STATE: And why is that?

MS. SHANE: The – when on my first case – well, at all my case conferences with Mr. Hill, even before I met with Mr. Salter, it was essentially an accident defense. In Mr. Salter's interview with law enforcement, he had explained to law enforcement that he had taken his gun out to show that he wasn't a threat. In fact, he had offered, I think, he called the – his girlfriend's mother; I think her name was Gail. I think he called her Momma Gail or something like that – and he was going to show her – give her the gun; say, here, I just want to talk to her, I'm not going to hurt her. And when he – but when he pulled the gun out to turn it over, the mother's boyfriend and I think the son – the brother of his girlfriend rushed him and the gun accidentally went off. So – and then he never changed that. That was his statement.

And when I – when we spoke – when I spoke with Mr. Salter, that – there was never any other – he maintained that the whole time. He didn't change that as being what happened. And so that was going to be our defense; it was an accidental discharge, prompted by him being jostled by the boyfriend and the brother.

STATE: Do you recall if you or Mr. Hill at any point in time requested that the – a certain jury instruction be read to the jury regarding a crime of passion?

MS. SHANE: No, no. When I did – and I did the jury instructions. I mean, I don't think it was appropriate because we wanted many that he – that would – I wasn't aware until I got notice of this hearing that this was even an issue. That's the first time I'd ever heard. And I don't believe that a crime of passion would have been – I think that would have been an inconsistency since – to accident. I don't – because he was never admitting that he actually shot her on purpose, which I believe would be a requirement to say I did it, but I did it in passion. So – but I wasn't – that never was raised. It was always I didn't shoot her, the gun went off accidentally because I was jostled by being – being jumped.

STATE: And although it may have not ever been raised by Mr. Salter, you still knew about that defense, but based on what you – the information that you had and your experience in defending these types

of cases, it wasn't a viable theory of defense either?

> MS. SHANE: No. Well, it wasn't – no, it wasn't because the State's theory, obviously, was he sent a text message threatening to kill, premeditated. That was their theory. And then ours was he didn't intend to shoot her at all. There was – it never occurred to me throughout the trial that there was any evidence that had raised that he did shoot her, but he did it in heat of passion.

After reviewing Defendant's allegations, the testimony and evidence adduced at the June 17, 2014 evidentiary hearing, the court file, and the record, the Court finds the testimony of trial counsel Gregory Hill and Anne Shane to be credible. . .

The Court finds that . . . trial counsel cannot be deemed ineffective for failing to pursue a heat of passion defense when the defense would have been inconsistent with Defendant's theory of the case that he accidentally shot the victim. *See Dufour v. State*, 905 So. 2d 42, 51-3 (Fla. 2005); *State v. Williams*, 797 So. 2d 1235, 1238-9 (Fla. 2001). As trial counsel testified, the evidence known to them and the Defendant's own statements made to law enforcement totally undermined the validity of a heat of passion defense. In fact, Defendant's testimony during the evidentiary hearing that his theory of defense at trial was that the shooting was accidental and that the gun accidentally went off after he was attacked corroborates this Court's finding. *See Stewart v. State*, 801 So.2d 59, 65-66 (Fla. 2001) (rejecting a claim that trial counsel was ineffective for not pursuing a voluntary intoxication defense where trial counsel testified that defendant had provided a detailed account of the crime and the State's potential experts would reveal the defendant's competency to stand trial).

Defendant argues and is correct that a heat of passion defense can be used as a partial defense to negate the element of premeditation in first degree murder. However, Defendant maintained to law enforcement as well as to his own attorneys that there was no premeditation; that he did not intend to harm the victim; and that the gun accidentally discharged after a fight.

The record demonstrates that trial counsel made an informed and reasoned decision to pursue a defense of accidental shooting based on Defendant's own statements to law enforcement as well as statements made to his attorneys. The underlying defense theory of the case is inconsistent with the heat of passion defense. Trial counsel cannot be ineffective for failing to raise a defense of heat of passion because it would have been inconsistent with Defendant's theory that the shooting was an accident. *See Evans v. State*, 946 So. 2d 1 (Fla. 2006) (holding that trial counsel cannot be deemed ineffective for failing to put on a defense of diminished capacity when the defense would have been inconsistent with defendant's theory of the case); *Dufour v. State*, 904 So. 2d 42, 52 (Fla. 2005) (holding that trial counsel was not ineffective for failing to put on defense of voluntary intoxication, in part because defense would have been inconsistent with defense's theory of innocence). The Court further finds that trial

counsels' decision to pursue a defense of accidental shooting was reasonable given Defendant's statements to law enforcement and to his attorneys that the shooting was accidental.

Additionally, because there was no evidence to support a defense theory of heat of passion, trial counsel cannot be deemed ineffective for failing to request the instruction. *See Daley v. State*, 951 So. 2d 17 (Fla. 4th DCA 2007). Accordingly, no relief is warranted. The Court must deny ground two of Defendant's motion.

(Dkt. 10, Ex. 2j pp. 276-82) (court's record citations omitted).

Salter repeatedly said in his recorded statement that the shooting was accidental. (Dkt. 10, Ex. 1m, pp. 574, 578, 635). He has not shown that counsel unreasonably chose to present the accidental shooting theory in light of this statement. As the state court found, a heat of passion defense was inconsistent with the accidental shooting theory. A claim that he was suddenly provoked to fire the gun in the heat of passion would have conflicted with his recorded statements that he and Mika were not arguing; that he was giving the gun to Jackson, who was upset with him, in order to prove that he would not hurt Mika; and that Bianco and Barnes's attack caused the gun to discharge. (*Id.*, pp. 564-65, 568-69, 580-81, 617, 624-25, 633, 638).

The state court did not unreasonably find that counsel performed competently in declining to present a defense that was inconsistent with the accidental shooting theory. *See Johnson v. Alabama*, 256 F.3d 1156, 1181 (11th Cir. 2001) ("As we have explained . . . '[a]lthough inconsistent and alternative defenses may be raised, competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury.' To argue [an alternative theory] might well have undercut the credibility of Johnson's lawyers with the jury." (quoting *Harich v. Dugger*, 844 F.2d 1464, 1470 (11th Cir. 1988))). *See also Nelson v. Nagle*, 995 F.2d 1549, 1554-55 (11th Cir. 1993) (petitioner failed to demonstrate deficient performance when counsel decided not to present inconsistent defenses of intoxication and factual innocence). Accordingly, Salter also fails

to show that counsel was ineffective in failing to request a heat of passion jury instruction.[8]

Salter has not shown that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Two.

Ground Three

Salter contends that counsel was ineffective in eliciting damaging testimony during his cross-examination of Arleen Jackson, the victim's mother. Jackson testified on direct that Salter entered the home through a rear door near the laundry room and asked if it was the way into the house. (Dkt. 10, Ex. 1j, p. 209). On cross, counsel elicited Jackson's testimony that Salter, who was familiar with the home, typically entered through the front door and that it did not make sense for him to come through the back door and ask if it was the way in. (*Id.*, pp. 226-27). Salter argues that calling attention to his unusual entrance bolstered the State's theory of premeditation by suggesting that he entered the home with a premeditated plan to kill Mika. The state court denied this claim:

> In ground three, Defendant alleges trial counsel was ineffective for eliciting damaging testimony during the cross-examination of Arleen Jackson. Defendant alleges that the testimony elicited helped prove the premeditation element required to convict Defendant of first-degree murder. Defendant alleges the following testimony elicited during the cross-examination of Arleen Jackson was damaging to his case:
>
> COUNSEL: Good morning, Ms. Jackson.
>
> JACKSON: Good morning.
>
> COUNSEL: Prior to September 8th, 2009, how many times had Mr. Salter been to your house?
>
> JACKSON: A lot of times.
>
> COUNSEL: And which way did he normally come into the house?

---

[8] The Court notes that the jury was instructed that a homicide is excusable if the killing "occurs by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation." (Dkt. 10, Ex. 1f, p. 117).

JACKSON: Front door.

COUNSEL: And would it be fair to say he was familiar with the layout of the house?

JACKSON: Yes.

COUNSEL: So he knew which doors went where?

JACKSON: Yes.

COUNSEL: Knew where the back door went?

JACKSON: Right.

COUNSEL: Knew where the bedroom was?

JACKSON: Right.

COUNSEL: Knew where the bathrooms were?

JACKSON: Of course.

COUNSEL: The kitchen was?

JACKSON: Right.

COUNSEL: Did he know where the laundry room was?

JACKSON: Of course.

COUNSEL: And he knew there was a doorway out.

JACKSON: Yes.

COUNSEL: So did it make any sense when he came in asking is this the way in the house if he had been there a number of times and had already known the layout of the house?

JACKSON: We have two back doors. So yes, that didn't make no sense, but he knew.

Defendant alleges that this testimony was damaging to his case as it corroborated other evidence tending to prove premeditation. Specifically, Defendant alleges the testimony elicited that Defendant normally enters the residence through the front door and was

familiar with the layout of the residence was damaging. Defendant alleges that this testimony coupled with the text messages allowed the jury to draw an inference that Defendant was following up on a plan to kill the victim thereby refuting Defendant's theory of defense that he did not intend to kill the victim when he went to her residence. Defendant alleges that if trial counsel had not elicited this testimony during the cross-examination of Arleen Jackson, the jury would not have heard that it was odd that Defendant entered through the back door because he usually entered through the front door. Defendant alleges that had this testimony not been elicited, the State would not have been able to prove premeditation and he would have been convicted of a lesser included offense.

During the direct examination of Arleen Jackson, the following testimony, in part, was elicited:

> STATE: Okay. Now, I want to take you back to that night and walk you through it. On that night, you recall that Mr. Salter arrived, correct?
>
> JACKSON: Right.
>
> STATE: What were you doing before he arrived?
>
> JACKSON: I was doing laundry.
>
> STATE: And in your house, where is the laundry room located?
>
> JACKSON: It's in the back of the room, the back of the house off of my son's bedroom.
>
> STATE: And were you in the laundry room when Mr. Salter arrived?
>
> JACKSON: Yes.
>
> STATE: And which door did he come through in your house?
>
> JACKSON: He came through the back door by – through the laundry room.
>
> STATE: And at the time he came into your house, did you think there was anything going on?
>
> JACKSON: No.
>
> STATE: And was there anything odd about him going through the laundry room?

JACKSON: At the time I didn't think nothing of it, no.

STATE: Okay. When he came through the laundry room, did he say anything to you?

JACKSON: He asked me was this the way into the house and I said yes and he asked me was Mika there and I said yeah.

At the evidentiary hearing, Defendant testified that trial counsel elicited the following damaging information during the cross-examination of Ms. Jackson: "[Defendant] came through the laundry room door; that [Defendant] knew the layout of the house; and that it was odd that [Defendant] would come through the back door". Defendant testified that the testimony elicited contributed to the premeditation element.

At the evidentiary hearing, Gregory Hill testified as to his strategy during the cross-examination of Ms. Jackson. Mr. Hill first testified that there was a dispute in the version of events between Ms. Jackson and Defendant regarding whether Defendant entered the residence through the back door or the front door. Defendant maintained he entered through the front door while Ms. Jackson maintained Defendant entered through the back door. Mr. Hill testified that he discussed this discrepancy with Defendant prior to trial and was prepared to address the discrepancy during the cross-examination of Ms. Jackson. During direct examination, Ms. Jackson testified that Defendant entered through the-back door and asked her if this was the way into the house. Mr. Hill testified that he elicited the information Defendant complains of during Ms. Jackson's cross-examination in order to impeach her credibility. Mr. Hill testified that it was important to elicit that information to show how incredulous Ms. Jackson's testimony was considering Defendant was familiar with the layout of the house and knew how to get around the house, so it would make no sense for Defendant to ask Ms. Jackson if the back door was an entrance into the residence. Last, Mr. Hill testified that he did not believe that he presented or elicited any testimony that had not been heard on direct examination or that hurt or damaged Defendant's theory of defense. In fact, Mr. Hill testified that "the very purpose of asking the questions was to impeach [Ms. Jackson's] credibility with the miraculous statement that [Defendant] had to ask directions for a house he was familiar with."

After reviewing Defendant's allegations, the testimony and evidence adduced at the June 17, 2014, evidentiary hearing, the court file, and the record, the Court finds the testimony of trial counsel Gregory Hill to be credible. . .

The Court finds that trial counsel made a strategic decision to elicit the complained of information during the cross-examination of Ms. Jackson. Specifically, trial counsel made a strategic decision to elicit that Defendant was familiar with the layout of the residence and that it was odd that Defendant would enter through the back door and not the front door like he usually did in an effort to impeach the credibility of Ms. Jackson. Trial counsel testified that "the very purpose of asking the questions was to impeach

[Ms. Jackson's] credibility with the miraculous statement that [Defendant] had to ask directions for a house he was familiar with." The Court finds that trial counsel's strategic decision to elicit the above-mentioned information during the cross-examination of Ms. Jackson was reasonable as the purpose of eliciting the information was to impeach the credibility of the witness. *See Brown v. State*, 846 So. 2d 1114, 1124 (Fla. 2003) (holding that counsel was not ineffective for opening the door to damaging testimony during the cross-examination of an FBI agent when trial counsel had a specific purpose for eliciting the testimony finding that it was a reasonable, strategic decision). As such, Defendant cannot satisfy the deficiency prong of *Strickland*. Accordingly, in view of the proper, strategic decision of counsel, no relief is warranted. The Court must deny ground three of Defendant's motion.

Further, even if counsel was deficient in his cross-examination of Ms. Jackson, the Court finds that Defendant failed to satisfy *Strickland*'s prejudice requirement. Even in the absence of the testimony elicited during cross-examination, the jury was still exposed to the testimony elicited during the direct examination of Ms. Jackson, incriminating text messages sent to the victim by Defendant and other incriminating physical evidence, and witness testimony connecting Defendant to the victim's murder. Therefore, any harm done by Ms. Jackson's testimony during cross-examination was neutralized, and the reliability of the proceeding was not compromised. Accordingly, in view of the overwhelming evidence, and the proper, strategic decisions of counsel, no relief is warranted. The Court must deny ground three of Defendant's motion.

(Dkt. 10, 2j, pp. 282-87) (court's record citations omitted).

Salter does not show that the court unreasonably applied *Strickland* in finding that counsel made a reasonable strategic decision to try to undermine Jackson's credibility. *See Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (a tactical decision amounts to ineffective assistance "only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983))).

Further, Salter has not shown prejudice as a result of counsel's decision to ask Jackson about Salter's entrance. To establish first degree murder, the State had to prove beyond a reasonable doubt that 1) Mika was dead; 2) the death was caused by the criminal act of Salter; and 3) there was a premeditated killing of Mika. (Dkt. 10, Ex. 1f, p.120). The jury was instructed that:

"Killing with premeditation" is killing after consciously deciding to do so. The decision must be present in the mind at the time of the killing. The law does not fix the

exact period of time that must pass between the formation of the premeditated intent to kill and the killing. The period of time must be long enough to allow reflection by the defendant. The premeditated intent to kill must be formed before the killing. . . . It will be sufficient proof of premeditation if the circumstances of the killing and the conduct of the accused convince you beyond a reasonable doubt of the existence of premeditation at the time of the killing.

(*Id.*).

Based on Salter's text messages to Mika and the testimony about events immediately preceding the shooting, including Salter's angry argument with Mika and his demanding to know who she was talking to on the phone, as well as eyewitness O.J. Bates's recounting of the shooting, there is no reasonable probability that the outcome would have been different if the jury had not heard that Salter uncharacteristically entered the house through the back door. Salter does not show that the state court's ruling involved an unreasonable application of *Strickland* or an unreasonable determination of fact. He is not entitled to relief on Ground Three.

Grounds Four And Five

A. *Defaulted Claims*

Before trial, the state court directed that Salter be evaluated for "mental[] retard[ation]" and competency to proceed, and, on June 2, 2010, adjudicated him competent to proceed. (Dkt. 10, Ex. 1e, p. 3; Ex. 1f, pp. 27-30, 36-39, 50-53). In Ground Four, Salter contends that the trial court did not conduct a proper hearing when it adjudicated him competent to proceed, resulting in a federal due process violation. In Ground Five, Salter argues that counsel was ineffective in failing to "secure compliance with" Florida Rule of Criminal Procedure 3.210, which governs procedures for raising incompetency, and "for not allowing the Petitioner to be thoroughly examined for competency at a mental health facility." (Dkt. 1, p. 19).

Salter was required to exhaust these claims of trial court error and ineffective assistance by raising them in state court before presenting them in his federal habeas petition. *See* 28 U.S.C.

§ 2254(b)(1)(A). Salter concedes that he failed to exhaust the claims. Because he cannot return to state court to file an untimely appeal or postconviction motion, *see* Fla. R. App. P. 9.140(b)(3), Fla. R. Crim. P. 3.850(b), the claims are procedurally defaulted. *See Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001) ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established.").

Salter alleges that he has established cause to excuse the default because his alleged incompetence prevented him from raising the claims in state court. "To establish 'cause' for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). The Eleventh Circuit has "assume[d] that a pro se habeas petitioner who lacked the mental capacity to understand the nature and object of [state] habeas proceedings and to present his case for habeas relief in a rational manner would have cause for omitting a claim in such proceedings." *Smith v. Newsome*, 876 F.2d 1461, 1465 (11th Cir. 1989).

Salter has not established that he lacked the mental capacity to understand his direct appeal and state postconviction proceedings, when he could have raised the claims of trial court error and ineffective assistance of counsel. *See id; see also Farabee v. Johnson*, 129 Fed. App'x 799, 804 (4th Cir. 2005) (petitioner failed to demonstrate cause when he did not present evidence that his "mental illness interfered with his ability to appreciate his litigation position or to make rational decisions concerning the litigation during the entirety of the relevant time periods . . . so that he was unable to consult with counsel, file pleadings, or otherwise comply with state procedural requirements."); *Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir.1999) (in determining cause, "[m]ental illness prejudices a petitioner if it interferes with his or her ability to comply with state procedural requirements.");

*Ervin v. Delo*, 194 F.3d 908, 916 (8th Cir. 1999) (a petitioner's "alleged depression could not amount to cause excusing [petitioner's] procedural default" where the "alleged depression did not hinder his ability to file a pro se postconviction motion" or prevent him from consulting with postconviction counsel).

Salter alleges that he could not bring the claims in state court because he was incompetent. The test for competency is "whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding–and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). However, there is no evidence that Salter was incompetent at any time that he could have conferred with counsel about the alleged trial court error in adjudicating him competent. Specifically, no part of the record from pre-trial proceedings on or after June 2, 2010, the trial itself, or the pendency of his direct appeal indicates that he lacked the mental capacity to understand the proceedings. Further, there is no evidence of Salter's incompetence during postconviction proceedings, when he could have raised the claim of ineffective assistance of counsel. Salter presented a comprehensible *pro se* postconviction motion, in which he raised three claims for relief supported by law and facts. (Dkt. 10, Ex. 2f, pp. 33-50). When he testified at the postconviction evidentiary hearing, he answered questions appropriately and did not express any confusion or uncertainty about the proceedings. (Dkt. 10, Ex. 2i, pp. 225-35). Salter offers no other evidence of his incompetency during the relevant time periods.[9]

---

[9] Salter points out that in January and February 2010, Dr. Carptener and Dr. Maher found him incompetent to proceed. (Dkt. 1, pp. 31-34, 36-39). However, in March 2010, Dr. Bursten found that Salter appeared to be malingering or "'faking' Trial Incompetence" and that, even though the apparent malingering prevented Dr. Bursten from rendering an opinion on competence, the trial court could determine that Salter was competent. (*Id.*, pp. 48-54). In May 2010, Dr. Taylor opined that Salter was competent to proceed. (*Id.*, pp. 56-62). Salter also addresses an October 2, 2010 letter to counsel by Dr. McGovern, who conducted testing on Salter, apparently at counsel's request. This letter does not establish Salter's incompetency, however. Dr. McGovern addressed Salter's learning disability,

Accordingly, Salter has not shown that he was incompetent so as to excuse the procedural default of his trial court error and ineffective assistance claims. He does not contend that he has established the fundamental miscarriage of justice exception. Therefore, his claims of trial court error and ineffective assistance of counsel are procedurally defaulted and barred from review.

B.    *Merits Review: Substantive Due Process Claim*

Salter alleges that he was "tried, convicted and sentenced while incompetent" in violation of his federal right to due process. (Dkt. 1, p. 17). Although he did not raise this claim in state court, a substantive due process claim alleging that a petitioner was tried while incompetent cannot be defaulted. *Wright v. Secretary, Dep't of Corr.*, 278 F.3d 1245, 1258-59 (11th Cir. 2002). The conviction of a mentally incompetent defendant violates due process. *Pate v. Robinson*, 383 U.S. 375 (1966). Salter must present facts showing his incompetency:

> A petitioner may make a substantive competency claim by alleging that he was, in fact, tried and convicted while mentally incompetent. [*James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992)]. In contrast to a procedural competency claim, however, "a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." *Id.* A petitioner who presents "clear and convincing evidence" creating a "real, substantial and legitimate doubt" as to his competence to stand trial is entitled to a hearing on his substantive incompetency claim. *Id.* at 1573 (quoting *Fallada* [*v. Dugger*, 819 F.2d 1564, 1568 n. 1 (11th Cir. 1987)]. To show entitlement to a postconviction evidentiary hearing on a substantive competency claim, "the standard of proof is high [and] the facts must positively, unequivocally, and clearly generate the legitimate doubt." *Card v. Singletary*, 981 F.2d 481, 484 (11th Cir.1992) (quotations omitted), *cert. denied*, 510 U.S. 839, 114 S.Ct. 121, 126 L.Ed.2d 86 (1993).

*Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995)

Salter has not shown that he was tried while incompetent under the *Dusky* standard. The Court

---

possible brain injury, and poor engagement. (*Id.*, pp. 64-65). But Dr. McGovern concluded that Salter's performance on several tests, which may have suggested that he purposefully gave incorrect responses, precluded obtaining valid and reliable psychological and/or neuropsychological results. (*Id.*, p. 65). Dr. McGovern issued no opinion on Salter's competency to proceed.

has reviewed the entire trial transcript. It indicates that Salter understood the proceedings, conferred with counsel, and answered questions appropriately. Specifically, during the trial, he responded when asked about a stipulation to the victim's identity, requested that his attorneys file a motion to disqualify the judge following the judge's ruling on a motion for mistrial, responded to the judge's questions about testifying, and stated that he made the decision not to testify after consulting with his attorneys. (Dkt. 10, Ex 1i, p. 9; Ex. 1l, pp. 540-42; Ex. 1n, pp. 740-42). Further, the trial transcript is devoid of any instances of Salter's acting inappropriately, showing an inability to consult with counsel, or expressing confusion or a lack of understanding about the proceedings. Lastly, Salter's postconviction evidentiary hearing testimony shows that he discussed the case and the evidence with his attorneys while he awaited trial. (Dkt. 10, Ex. 2i, p. 226). In sum, the record shows that Salter consulted with his counsel and had an understanding of the proceedings. Furthermore, even a history of mental instability does not demonstrate incompetency without a specific showing of how such issues affected a petitioner's competency at the time. *See Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) ("[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." (quoting *Card v. Singletary*, 981 F.2d 481, 487-88 (11th Cir. 1992))). Salter fails to establish that he was tried and convicted while incompetent in violation of his federal right to due process. He is not entitled to relief on Grounds Four or Five.

Any of Petitioner's claims not specifically addressed herein have been determined to be without merit.

Accordingly, it is ordered that:

1. Salter's petition for writ of habeas corpus (Dkt. 1) is **DENIED**.

2. The Clerk is directed to enter judgment against Salter and to close this case.

3. Salter is not entitled to a certificate of appealability ("COA"). A petitioner does not have absolute entitlement to appeal a district court's denial of his habeas petition. 28 U.S.C. § 2253(c)(1). A COA must first issue. *Id*. "A [COA] may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." *Id*. at § 2253(c)(2). To make such a showing, Salter "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Salter has not made this showing. Because Salter is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**ORDERED** in Tampa, Florida, on July 30, 2018.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Cedrick Salter
Counsel of Record